[Civ. No. 20905. Second Dist., Div. Two. Feb. 29, 1956.]

CALIFORNIA KITCHENS, INC. (a Corporation), Respondent, v. UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA et al., Defendants; LOS ANGELES DISTRICT COUNCIL OF CARPENTERS et al., Appellants.

598

Arthur Garrett, Charles Scully and James M. Nicoson for Appellants.

Zimmerman, Kelly & Thody, Joseph P. Kelly, Jr., and W. Alan Thody for Respondent.

MOORE, P. J.—This is an appeal from the order granting a preliminary injunction against the defendants, restraining them and each of them from interfering with the sale, distribution and installation of "Bilt-Well" cabinets, distributed by respondent for installation on behalf of the purchasers thereof at specified places and from causing, ordering or directing any person to refuse to handle such cabinets or hampering, in any manner, any person from handling or installing them.

Respondent is a California corporation. April 1, 1954, it purchased the assets of the Kitchen Division of Stanthony Corporation of Delaware. Included among such assets was an exclusive franchise for the distribution and sale in California of "Bilt-Well" kitchen cabinets, a product of Carr, Adams and Collier Company of Dubuque, Iowa. Also included in the purchased assets were firm orders and commitments from four certain California concerns.

Immediately after having acquired such assets, respondent accepted orders for 176 of the cabinets from B.R.S. Corporation to be used in a tract of 22 houses in Los Angeles County; 5,600 cabinets for 700 houses in the same tract. Appellants or their agents visited the tract twice daily for a week concerning the use of Bilt-Well cabinets and finally effected a cancellation of the order of the B.R.S. Corporation.

Because of the activities of appellants, Harold Hensgen and Associates cancelled its order for 750 Bilt-Well cabinets. An officer of that company notified respondent that he was uncertain whether Harold Hensgen could use the cabinets

because of union trouble and exhibited an unsigned letter to an officer of one of the unions which the Hensgen firm was asked to sign; it said the Bilt-Well cabinets would not be used on a tract of 68 houses until the local or a district representative had approved them.

Respondent had oral orders for 27 Bilt-Well cabinets to be installed in a model home at Pan-Pacific Auditorium at Los Angeles and for 1,680 cabinets for 168 houses to be erected by Kenbo Construction Company.

Respondent engaged Erwin Weber to install cabinets in the "model home" of the Kenbo Construction Company at the Pan Pacific Auditorium "Home Show." Weber testified that Mr. Eisenmayer, president of respondent company, told him that Eisenmayer had an agreement with Earl Thomas, one of the appellants, covering the installation of the Bilt-Well cabinets in the Kenbo model home, but on May 10, 1954, Weber was expelled from the auditorium by an agent of appellant Local No. 1052 on the charge that the cabinets did not carry the union label. Such events caused a cancellation of the orders for the 27 and the 1,680 Bilt-Well cabinets.

In addition to the successful interference by appellants as shown above, respondent had orders for 444 cabinets to be installed in a tract being developed at Lancaster. Also respondent received purchase orders for 927 Bilt-Well cabinets for 103 houses in Larchmont Village Inc., near Sacramento, and a commitment for 26,100 cabinets for 2,900 prospective homes there. While appellants did not succeed in causing a rescission of any of the orders mentioned in this paragraph, witness Brock for appellants testified that his company, M. J. Brock and Sons, was held up for a period of time by appellants' interference.

Secretary-treasurer Thomas of Los Angeles District Council of Carpenters deposed that "defendants desire to protect the workingmen of Southern California engaged in the cabinet-making industry from being degraded into a condition of peonage by the activities of plaintiff corporation and others and to that end have requested the employers and contractors mentioned in paragraph IX of the complaint not to use cabinets produced at sub-standard wage scales, including Bilt-Well cabinets." Appellant La Chapelle admitted that he had advised Larchmont Village Inc. twice that the lack of a union label on the Bilt-Well cabinets might cause complaint.

Respondent urges three propositions, namely, (1) the superior court had exclusive jurisdiction; (2) no labor dis-

pute existed; (3) the amended complaint declares a valid cause of action. Conceding, *arguendo*, that a valid cause of action is stated, the facts will disclose that a labor dispute did exist while the law leaves no doubt that the superior court did not have exclusive jurisdiction of the subject matter or any jurisdiction unless the N.L.R.B. had first declined to entertain the complaint.

The controversy brings to the fore two statutes that bear upon the subject of a labor dispute. ■ One is the Cartwright Act, a California statute adopted in 1907. (Deering's Gen. Laws, Act 8702; Bus. & Prof. Code, §§ 16700-16758.) While, at first glance, it appears to have been designed primarily to prevent the organization of trusts for the control of markets for merchandise, its definition of a trust may, not unreasonably, include any contract "to carry out restrictions in trade or commerce"; to prevent competition in "manufacturing, sale or purchase of merchandise" etc. Section 16757 provides that it is sufficient to prove that a trust or combination exists and that defendant belonged to it or acted for it. Any court having jurisdiction in the county where the defendant resides may entertain an action arising under the act. (Bus. & Prof. Code, § 16750.)

■ The other statute concerned is the "National Labor Relations Act" as amended by the "Labor Management Relations Act, 1947" sometimes known as the "Taft-Hartley Act" and herein referred to as "N.L.R.A." (29 U.S.C.A., § 157.) By its provisions it enlarged the functions of the National Labor Relations Board, herein referred to as "N.L.R.B." The N.L.R.A. was enacted following the World War II when the maintenance of the peace and serenity of the industrial and commercial life of the entire nation was second only to the cessation of battles and the winning of the peace. While the N.L.R.A. makes provision for protecting the activities of labor unions (§ 7), it proscribes unfair labor practices such as encouraging the "employees of any employer to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods . . . or to perform any services, where the object thereof is" to require an employer "to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer . . ." (N.L.R.A. as amended, 29 U.S.C.A. § 158(b)(4)(A).) Respondent denies that appellants induced or encouraged any employees to

engage in a concerted refusal to handle Bilt-Well cabinets. It asserts that the union's dealings were entirely with the employers. It appears, however, that the amended complaint alleges that defendants made threats to the contractor "that if it attempted to install said Bilt-Well cabinets, all union men would be immediately ordered off the job so that all work would cease"; and the injunction forbids defendants to threaten any contractors "that, if they, or any of them, attempt to install Bilt-Well cabinets, all union men will immediately be ordered off the job or jobs." It is immaterial whether the union personally instructed the individual employee not to handle Bilt-Well cabinets or whether the supervisors were instructed to direct the employees to abstain from installing such cabinets. The results are the same. In either event, the employees were affected. ■ Furthermore, the question with reference to the dispute as to whether the employees or employers were coerced is one for the N.L.R.B. first to determine. If it should decide that the dispute does not affect the employees, under the N.L.R.A., then the state court may assume jurisdiction.

Respondent has cited and quoted excerpts from numerous decisions (*Weber* v. *Anheuser-Busch Inc.*, 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546] ; *Hill* v. *Florida*, 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782] ; *Garner* v. *Teamsters, C. & H. Local Union*, 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228, 244] ; *Allen-Bradley Local* v. *Wisconsin Emp. Relations Board*, 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154] ; *Algoma Plywood & Veneer Co.* v. *Wisconsin Emp. Relations Board*, 336 U.S. 301 [69 S.Ct. 584, 93 L.Ed. 691]) for the purpose of showing that "the commerce clause does not itself preclude a state from regulating those matters which not being themselves interstate commerce, nevertheless affect the commerce"; that the "N.L.R. Management Act leaves much to the states" (*Garner* v. *Teamsters, C. & H. Local Union, supra*) ; the state was allowed to enjoin mass picketing and property damage ; the mere enactment of the National Labor Relations Act did not exclude state regulation of the type which Wisconsin has exercised, namely, injunction against mass picketing, threats of bodily injury and property damage to employees, obstruction of streets, blocking of entrance to and egress from a factory, picketing employees' homes (*Allen-Bradley Local* v. *Wisconsin Emp. Relations Board, supra*) ; that certain decisions "clearly interdict any rule by the Board that every type of concerted activity is beyond the

reach of the states' adjudicatory machinery" (*International Union* v. *Wisconsin Emp. Relations Board*, 336 U.S. 245 [69 S.Ct. 516, 93 L.Ed. 651]) ; that the N.L.R.A. does not prevent the states from enforcing their own policies in matters not governed by the federal law. (*Algoma Plywood & Veneer Co.* v. *Wisconsin Emp. Relations Board, supra.*) Respondent contends that appellants combined and conspired illegally to restrain trade and commerce in Bilt-Well cabinets and directed their activities against contractors; that "there is no language in the N.L.R.A. as amended, which either prohibits or protects the concerted activities of the appellants here."

In *Milwaukee Boston Store Co.* v. *American Federation of Hosiery Workers*, 269 Wis. 338 [69 N.W.2d 762, 773], it was held that the "type of secondary picketing which is proscribed by the federal act is that which involves coercion or restraint of the *employees* of a secondary or neutral employer with the object of persuading such employees to take concerted action . . . The economic pressure exerted by defendants' picketing was directly upon the Boston Store and not indirectly through its employees . . . the proscriptions of section 8(b) (4) of the National Labor Relations Act 'are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer.' Therefore, the National Labor Relations Board would have had no power to assume jurisdiction or prohibit such secondary picketing by the defendants herein." By that and other decisions, respondent contends that the N.L.R.B. did not have jurisdiction over the controversy between it and appellants but that, on the contrary, the cited California statute confers exclusive jurisdiction over the matters alleged against appellants.

It is not to be denied that the argument of respondent, supported as it is by respected authority, commands most serious consideration, but certainly not an obsequious approval. ■ In view of the number of the cabinets sold to contractors in California and the commercial value thereof, it cannot be denied that N.L.R.B.'s exclusive primary jurisdiction entitled it to determine whether the transactions involved establish that the free flow of interstate commerce would have been affected (*National Labor Relations Board* v. *Washington-Oregon Shingle Weavers' Dist. Council*, 211 F.2d 149, 151), thereby conferring exclusive jurisdiction upon the N.L.R.B. ■ The complaint charged that appellants acted in concert to engage in boycotts, coercion, threats and intimida-

tions and thereby caused respondent's customers to cease the purchase of Bilt-Well cabinets and were about to forbid their several members to handle such cabinets and to enforce their demands by strikes and work stoppages. Such acts constitute violations of the Taft-Hartley Act (N.L.R.A.) which was enacted to prevent boycotts and kindred acts. Inasmuch as the Congress conferred upon the N.L.R.B. the exclusive authority to enforce such statute by injunctive processes (29 U.S.C.A. § 160, subds. (a), (b), (c), (e), state courts are thereby divested of jurisdiction to function with regard to acts inhibited by the N.L.R.A. ■ Also, because the act guarantees employees the right to engage in activities for their mutual aid and protection, the N.L.R.B. has jurisdiction to hear and determine such grievances as those alleged in respondent's complaint (*National Labor Relations Board* v. *Washington-Oregon Shingle Weavers' Dist. Council, supra,* p. 152, and by the same token the superior court is without power to entertain the charges prior to a refusal of jurisdiction by the N.L.R.B. Whether an unfair labor practice was pursued by appellants is not within the competence of the state court. In the Weavers' case, *supra,* the Sound Shingle Company received a carload of shingles from a Canadian concern. A union shop steward suggested that the shingles bore no union label, called the employees off and forbade the employees of the factory to which the shingles had been shipped to work on the Canadian shingles. There was no evidence that the work stoppage at the company's plant was designed for any purpose other than "to compel the Company to cease using unfair shingles produced by another." The N.L.R.B. was held entitled to a judgment enforcing its order which was entered because the union was attempting to force an employer to cease using the products of another producer, an act prohibited by N.L.R.A. section 8(b)(4)(A). Whether the facts established amounted to unfair labor practice is a question which the superior court could not decide. Such questions, having been preempted by the national statute, are withdrawn from the state's cognizance until the N.L.R.B. has refused to take jurisdiction.

The vicissitudes of *Weber* v. *Anheuser-Busch, Inc., supra,* 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546], are illuminating on the question of the exclusive power of the N.L.R.B. in dealing with the secondary boycott. A labor union picketed an employer's plant to compel the employer to insert into a proposed collective labor contract a clause obligating the

employer to employ, for repairs or replacements only, contractors who had collective agreements with the union. Before the N.L.R.B. had acted upon its charges, the employer obtained judgment for an injunction in a state court of Missouri (which was affirmed by its Supreme Court) holding that the union had violated a statute against restraint of trade. The question presented to the federal Supreme Court was whether the state court's jurisdiction had been preempted by the authority vested in the N.L.R.B. On a review of the matter, the Supreme Court held: "A State may not enjoin under its own labor statute conduct which has been made an 'unfair labor practice' under the federal statutes." Such was the holding in *Garner* v. *Teamsters, C. & H. Local Union, supra,* 346 U.S. 485, 499 [74 S.Ct. 161, 98 L.Ed. 228, 244].

█ It is therefore established that a state court may not prohibit the exercise of rights which the N.L.R.A. protects. (*Hill* v. *Florida, supra,* 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782, 1784].) However, it must be borne in mind that the state courts are free to act upon such controversies as arise over which the Congress has not given specifically exclusive primary jurisdiction to the N.L.R.B. █ But a state may not inhibit conduct, the right to pursue which the N.L.R.A. has guaranteed. (N.L.R.A., § 7; *Amalgamated Assn. S.E.R. & M.C.E.* v. *Wisconsin Emp. Relations Board,* 340 U.S. 383 [71 S.Ct. 359, 95 L.Ed. 364, 375]; *LaCrosse Tel. Corp.* v. *Wisconsin Emp. Relations Board,* 336 U.S. 18 [69 S.Ct. 379, 93 L.Ed. 463, 469].) But a state may regulate such behavior as is not subject to regulation by the N.L.R.B. (*Allen-Bradley Local* v. *Wisconsin Emp. Relations Board, supra,* 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154, 1160]; *International Union* v. *Wisconsin Emp. Relations Board, supra,* 336 U.S. 245 [69 S.Ct. 516, 93 L.Ed. 651, 662].) From a consideration of the foregoing review, the cited decisions appear to have made it unlawful "for a state to impinge on the area of labor combat designed to be free" and, also, it is an obstruction of federal policy for a state to declare union activity "free for purposes which the Federal Act prohibits." (*Garner* v. *Teamsters, C. & H. Local Union, supra,* 346 U.S. 485, 499 [74 S.Ct. 161, 98 L.Ed. 228].)

*Weber* v. *Anheuser-Busch, supra,* gives no aid to respondent. It involved a jurisdictional dispute between two unions. It declared that N.L.R.A. covers the area of jurisdictional disputes and provides procedures and remedies with which

the state court is without competence to intrude. (*Dyer* v. *International Brotherhood of Teamsters*, 124 Cal.App.2d 778, 783 [269 P.2d 199].)

The recent decision of the California Supreme Court (*Garmon* v. *San Diego Building Trades Council*, 45 Cal.2d 657, 661 [291 P.2d 1]) suggests no relaxing of the conclusions heretofore announced by the federal Supreme Court. The Garmons, engaged in the lumber business, became involved in a dispute with labor organizations. They were awarded damages and the defendants were enjoined from certain activities. *After the N.L.R.B. had refused jurisdiction,* the plaintiffs sued in the superior court which found that the plaintiffs' operations affected interstate commerce and that plaintiffs had refused to execute a contract proposed by the unions. Basing its decision upon the authorities hereinabove reviewed and others, the Supreme Court held first that the N.L.R.B. has exclusive primary jurisdiction to prevent unlawful demands; that where the N.L.R.B. refuses to accept jurisdiction of a complaint because the effect of the complainant's business on interstate commerce is not substantial, the state courts may act.

The court points out that the reason for prohibiting state courts from acting where the N.L.R.B. has jurisdiction is to obtain uniform application of the substantive rules prescribed by N.L.R.A. and to avoid diversities and conflicts likely to result from a variety of local procedures and attitudes toward local controversies. The decision does not in the least detract from the exclusive jurisdiction of the N.L.R.B., but it held definitely that where a business has only "a limited effect on interstate commerce" the board may exercise its discretion to accept or refuse jurisdiction and "the legislative purpose must have been to give the state courts jurisdiction when the board specifically determines that the controversy will not affect the national economy." (*Supra*, p. 663.)

From the foregoing, it is clear that the affirmance of the Garmon judgment did not rest, in the slightest degree, upon the theory that the N.L.R.B. has not exclusive, primary jurisdiction. ▮ It is made equally clear that a state court may enforce rights, guaranteed by the Cartwright Act, after the N.L.R.B. has declined to act. ▮ A state court has no power to determine that the N.L.R.B. would refuse jurisdiction. Such power to withhold cognizance of a controversy is within the board's exclusive jurisdiction.

Further support for the doctrine that a state court cannot

exercise its jurisdiction over a labor controversy such as is involved in the action at bar, unless the N.L.R.B. has refused to take cognizance thereof, is found in the recent decision of *Charles H. Benton, Inc.* v. *Painters Union,* 45 Cal. 2d 677, 681 [291 P.2d 13]. Also, the recent unanimous decision (January 9, 1956) in *Local Union No. 25 of the International Brotherhood of Teamsters, C., W. & H. of America* v. *New York, New Haven & Hartford R. Co.,* 350 U.S. 155 [76 S.Ct. 227, 100 L.Ed. ——], in an action similar to the one at bar, holds that the jurisdiction of the N.L.R.B. is exclusive. The fact that injustices might result during the period prior to the decision of the N.L.R.B. to assume or reject jurisdiction is a problem for congressional consideration, and not for judicial action.

The order is reversed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied March 22, 1956.