[Sac. No. 6938.   In Bank.   May 19, 1959.]

RETAIL CLERKS' UNION, LOCAL NO. 1364, AFL-CIO (an Unincorporated Association) et al., Petitioners, v. SUPERIOR COURT OF TRINITY COUNTY, Respondent; CORNELIUS A. HOOD et al., Real Parties in Interest.

Charles P. Scully, Victor Van Bourg and Halpin & Halpin for Petitioners.

Stennett M. Sheppard, District Attorney, for Respondent.

Severson, Davis & Larson, Nathan R. Berke and George Brunn for Real Parties in Interest.

SCHAUER, J.—Petitioners (labor unions and organizers) seek a writ of prohibition (with mandatory as well as prohibitory effect) to compel respondent superior court of Trinity County (1) to desist from further proceedings in an action (hereinafter sometimes referred to as the basic or superior court action) brought against petitioners by the real parties in interest (employers who operate a retail market), (2) to dissolve an ''order for preliminary injunction and preliminary injunction'' entered in such basic action, and (3) to grant petitioners' ''motions to dismiss and vacate any judgment, order for preliminary injunction and preliminary injunction'' entered in that action.

The complaint in the subject basic action alleges that defendants (petitioners here) are interfering with plaintiffs' business by picketing to compel plaintiffs to execute collective bargaining agreements with the demanding unions; that the unions are not authorized to represent, or to negotiate for, any of plaintiffs' employes; but that the agreements contain a provision that plaintiffs will require their employes to become and remain members of the unauthorized unions (and thereby choose and designate such unions as their bargaining representatives) as a condition of retaining their employment. Plaintiffs in the basic action seek injunctive relief and ask leave to amend to set forth damages when the amount of such damages becomes ascertainable. The complaint alleges the enactment of a county ''right-to-work'' ordinance which by its terms became effective on the date of the filing of the complaint. The provisions of the ordinance (No. 228) are in all material respects, including the definition of ''labor organization'' in section 1, identical with the provisions of the San Benito County ordinance quoted and summarized in *Chavez* v. *Sargent, ante,* p. 162 [339 P.2d 801], footnote 1. The facts in this case, however, are antithetical to those in Chavez. There all three interested entities—employer, employes (the majority of them), and the subject union—want to execute a union shop agreement. Here, neither employers nor employes want a contract with or membership in the demanding unions. The unions, nevertheless, seek by the pressures of picketing to induce the employers to compel their employes to join such unwanted unions and constitute them their bargaining agents.

Petitioners attack the validity of the ordinance on various grounds; also they urge that exclusive jurisdiction of this controversy is in the National Labor Relations Board and the federal courts. We have concluded that the record does not

establish that exclusive jurisdiction is in the federal board and courts; that the ordinance is invalid for the reasons explained in *Chavez* v. *Sargent, ante,* p. 162 [339 P.2d 801]; but that since the subject superior court action seeks relief which conceivably can be afforded under the same state law which renders the ordinance void, the proceedings therein can continue on both the complaint and the defendants' cross-complaint.

The preliminary injunction attacked by petitioners restrains them from "picketing, boycott, strike, or threats" for the purpose of inducing plaintiffs-employers to make an agreement that they will require their employes to become or remain members of any labor organization as a condition of employment, in violation of Ordinance Number 228. In support of this injunction the court found, among other things, that "Most of the employees of plaintiffs are not members of the defendant labor organizations and the employees of plaintiffs have not at any time demanded from plaintiffs a union shop or union recognition, *nor have such employees participated at any time in the negotiations for collective bargaining agreements, nor have the employees of plaintiffs designated the defendants or any of them as their representatives for collective bargaining.*" (Italics added.) All of the italicized portion of the quoted finding is material but, as explained in the Chavez case, *ante,* p. 162 [339 P.2d 801] that which is of paramount importance in bringing this case within the control of the statutes which declare the overriding state policy and which must govern disposition of this litigation (Lab. Code, §§ 920-923, 1115-1122, 1126, quoted in *Chavez* v. *Sargent, ante,* footnotes 6 through 8) is the fact that plaintiffs' employes have not chosen or designated petitioners as their representatives.

The answer of petitioners (as defendants in the basic action) alleges "That the court has no jurisdiction of the subject matter of this action . . . in this, that the exclusive jurisdiction thereof lies with the judicial and administrative agencies of the United States." Petitioners also cross-complained, alleging that plaintiffs coerced their employes "to prevent the exercise of their right to full freedom of association, self-organization and designation of representatives of their own choosing." Plaintiffs' answer to the cross-complaint alleges "that the Court has no jurisdiction of the subject matter of the cross-complaint . . . in that the exclu-

sive jurisdiction thereof lies with the National Labor Relations Board.''

Petitioners urge that by the above quoted allegation of the answer they have alleged, and by the above quoted averment of the answer to the cross-complaint plaintiffs have admitted, that the plaintiffs' business affects interstate commerce within the meaning of the federal Labor Management Relations Act of 1947, as amended (the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq.); that under the national act the state court has no jurisdiction to grant relief on account of the conduct here in question; and that therefore (as in *Calise* v. *Superior Court* (1958), 159 Cal.App.2d 126, 133, 135 [3] [323 P.2d 859]) prohibition should issue. ■ We are not prepared to hold that the allegations of bare conclusions of law as to jurisdiction establish any facts as to the effect of any alleged labor practice upon interstate commerce (see *Brown* v. *Aguilar* (1927), 202 Cal. 143, 149 [259 P. 735]; *Kidwell* v. *Ketler* (1905), 146 Cal. 12, 17, 18 [79 P. 514] [pleader is not bound by allegation or admission of conclusion of law]; *Faulkner* v. *California Toll Bridge Authority* (1953), 40 Cal.2d 317, 329 [9], 330 [12] [253 P.2d 659] [conclusions of law are not admitted by demurrer]; *Wheeler* v. *Oppenheimer* (1956), 140 Cal.App.2d 497, 501 [3] [295 P.2d 128] [conclusion of law ''tendered no issue'']); rather, we agree with the superior court that in the present state of the record there is an unresolved ''factual question'' (in addition to questions of law) upon which determination of its jurisdiction may eventually depend. At the present time the allegations as to jurisdiction show at most that upon further proceedings in the basic action questions of federal preemption *may* be presented; but they show also that no such issue is ripe for resolution in this proceeding.

[■] Here, as in the Chavez case, *ante*, p. 162 [339 P.2d 801] the ordinance contravenes the state-wide statutory policy as to the freedom of employes to organize, select representatives, and through them bargain collectively for the traditional objectives of organized labor, subject only to such regulations and proscriptions as are set forth in the statutes or otherwise imposed by law (Lab. Code, §§ 920-923, 1115-1122, 1126; see by way of examples of ''regulations and proscriptions . . . otherwise imposed,'' the decisional law of *James* v. *Marinship Corp.* (1944), 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]; *Hughes* v. *Superior Court* (1948), 32 Cal.2d 850 [198 P.2d 885], affirmed *Hughes* v. *Superior*

*Court* (1950), 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985]);
likewise, the ordinance partially duplicates state-wide statutory policy insofar as it prohibits jurisdiction-organizational assaults on established employe-employer relationships; and its conflict with general law cannot be eliminated by mechanical separation of its language. The basic superior court action, therefore, cannot continue insofar as it seeks relief under the ordinance.

The subject action, however, can continue both on the complaint and on the cross-complaint in respect to any relevant relief which is not, on the facts, precluded by federal law and which is provided under state law as declared in sections 921 through 923, sections 1115 through 1122, and section 1126 of the Labor Code. (*Chavez* v. *Sargent, ante,* p. 162 [339 P.2d 801].) If it develops that plaintiffs' business does not affect interstate commerce within the meaning of the Labor Management Relations Act of 1947, and that defendants are picketing to compel plaintiffs (the employers) to violate state law by coercing their employes to designate the defendants as their exclusive bargaining representatives, and to accept terms and conditions of employment dictated by defendants, without authorization by plaintiffs' employes, then plaintiffs may be entitled to both injunctive relief and damages. If it develops that the subject dispute interferes with the flow of interstate commerce (see the Taft-Hartley declaration of policy and purpose, 29 U.S.C.A. § 141), then the alleged conduct of defendants, tortious but peaceful within the federal concept, cannot be restrained or redressed by the state. This conclusion follows because no facts are alleged or found which tend to exclude plaintiffs from the class segregated by the federal authority[1] for nonaccess to the courts. (*San Diego Building Trades Council* v. *Garmon* (1959), 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775]; *San Diego Bldg. Trades Council* v. *Garmon* (1957), 353 U.S. 26 [77 S.Ct. 607, 609, 1 L.Ed.2d 618].)

The preliminary injunction enjoins "any picketing, boycott, strike, or threat for the purpose of forcing and inducing plaintiffs to make an agreement requiring plaintiffs' employes to become or remain members of . . . any . . . labor organization, in order to obtain, retain or continue in

---

[1]The National Labor Relations Board, according to its present self-imposed limitation of jurisdiction, will not act in cases of alleged unfair labor practices where the employer is a retailer with a gross annual business of less than $500,000.

employment with plaintiffs *which in any way is in violation of Ordinance No. 228 of the County of Trinity, which became effective on September 18, 1957.*" (Italics added.) The unitalicized portion of the preliminary injunction is proper, for it enjoins conduct which under the circumstances found is tortious under the above referred to sections of the Labor Code and which has not been shown to affect interstate commerce so as to bring it within the purview of the national act. The emphasized portion of the preliminary injunction, characterizing the enjoined conduct as violative of the invalid ordinance, is mere descriptive surplusage, utterly void in any application.

For the reasons above stated, the alternative writ is discharged and the peremptory writ is denied.

Shenk, J., and Spence, J., concurred.

McCOMB, J.—I concur in the judgment and opinion, for the reasons expressed in my concurring opinion in *Chavez* v. *Sargent, ante,* p. 162 [339 P.2d 801].

TRAYNOR, J., Concurring and Dissenting.—I concur in the judgment insofar as it determines that the Trinity County ordinance is invalid. It is my opinion, however, that the finding relied upon by the majority opinion does not establish that petitioners' objective was unlawful under state law and that the preliminary injunction is therefore without support in the record.

Petitioners, certain unions and their officers seeking to organize plaintiffs' Super Market employees, commenced picketing the market to induce plaintiffs to execute union shop agreements. Plaintiffs' employees had not selected the unions as their bargaining agents, and it does not appear that they wish to be organized or to work under a union shop agreement. The majority opinion holds that picketing or other concerted activities by the unions to secure union shop agreements is therefore unlawful under state law. In the companion case of *Chavez* v. *Sargent, ante,* p. 162 [339 P.2d 801], the majority opinion holds that a union or closed shop agreement is lawful if a majority of the employees wish it and that in such a case picketing or other peaceful concerted activity to secure a union or closed shop is likewise lawful.

This is new law in this state. The majority opinions purport to find it in sections 920-923, 1115-1120, 1122, and 1126 of the

Labor Code. Since sections 920-923 had been interpreted to permit conduct now found to be proscribed, the majority opinions invoke the later-enacted Jurisdictional Strike Act (Lab. Code, §§ 1115-1120) and Labor Code, section 1122, to support their conclusion that organizational activity carried on without the support of or against the wishes of a majority of the employees involved is unlawful. The Jurisdictional Strike Act, however, deals only with disputes between two or more labor organizations, and accordingly, to make its provisions relevant to a dispute between organized and unorganized labor, the majority opinions are driven to create a fictitious labor organization consisting of the unorganized employees and then pitting that unorganized "organization" against the unions.

The Jurisdictional Strike Act says nothing whatever about the new test of legality now adopted. To avoid the prohibition of organizational activities by a majority of the employees against a dissident unorganized minority under the new construction of that act the majority opinions judicially amend it to permit jurisdictional strikes carried on by unions representing a majority of the employees involved. Such amendment is a flagrant usurpation of legislative power.

Furthermore, neither section 1122 nor 1126 supports the new rules created by the majority opinions. Section 1122, like section 923, proscribes employer interference with labor organizations. Far from indicating a legislative repudiation of the settled judicial interpretation of section 923 when section 1122 was enacted, it constitutes a legislative adoption of that interpretation. Section 1126 merely provides for the enforcement of collective bargaining agreements. It is silent as to the validity of closed or union shop provisions in such agreements or the legality of concerted activity undertaken to secure them.

Before the decision of this court in *Garmon* v. *San Diego Bldg. Trades Council,* 49 Cal.2d 595 [320 P.2d 473], it was settled that a closed or union shop is a proper objective of concerted labor activity, since it is reasonably related to union welfare and the betterment of working conditions whether or not any or a majority of the employees belong to the union or wish to bargain collectively. (*J. F. Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550]; *McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal.2d 311, 315-325 [106 P.2d 373]; *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 401 [106 P.2d 414];

*Magill Bros.* v. *Building Service etc. Union,* 20 Cal.2d 506, 508 [127 P.2d 542] ; *James* v. *Marinship Corp.,* 25 Cal.2d 721, 730 [155 P.2d 329, 160 A.L.R. 900] ; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599, 604 [165 P.2d 891, 162 A.L.R. 1426] ; *Charles H. Benton, Inc.* v. *Painters Local Union,* 45 Cal.2d 677, 681 [291 P.2d 13].) The reasons for permitting picketing to compel a closed or union shop, even when none of the employees belong to the picketing union, were articulated in *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 401 [106 P.2d 414] : ''The members of a labor organization may have a substantial interest in the employment relations of an employer although none of them is or ever has been employed by him. The reason for this is that the employment relations of every employer affect the working conditions and bargaining power of employees throughout the industry in which he competes. Hence, where union and non-union employees are engaged in a similar occupation and their respective employers are engaged in trade competition one with another, the efforts of the union to extend its membership to the employments in which it has no foothold is not an unreasonable aim.'' (See also Schauer, J. dissenting in *Bautista* v. *Jones,* 25 Cal.2d 746, 767, 783 [155 P.2d 343].)

In the Garmon case, by reinterpreting section 923 of the Labor Code and invoking the Jurisdictional Strike Act, the court held that a union shop contract is an unlawful objective under state law when none of the employees wish to join or be represented by the union. The court concluded that by signing a union shop agreement the employer would interfere with his employees' rights ''in the designation of . . . representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection'' (Lab. Code, § 923) in violation of section 923. As I pointed out in my dissent in the Garmon case, the court in effect overruled a settled rule of decision to the contrary and in particular *Shafer* v. *Registered Pharmacists Union,* 16 Cal. 2d 379, 383-388 [106 P.2d 403], which expressly held that sections 920-923 of the Labor Code do not restrict the right of labor to engage in concerted activity to attain a closed or union shop.

The Garmon case dealt with a business that affected interstate commerce and was reversed on the question of federal preemption in *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775]. Moreover, it was decided on an erroneous assumption that the conduct found

tortious under state law was also illegal under federal law. As the United States Supreme Court pointed out, however, it was by no means clear that the conduct involved violated federal law. In fact, it may have been protected by that law. (See Labor Management Relations Act, §§ 7, 8 (b), 29 U.S.C. §§ 157, 158 (b).) If, despite these weaknesses in this court's Garmon decision, the majority opinions in the present cases adhered to it on the question of the illegality of union or closed shop contracts and concerted activity to achieve them under state law, it would be necessary to determine if that case controls the present ones. In my opinion, however, there is no basis whatsoever in the statutory law of this state for distinguishing between a closed or union shop agreement sought by a union representing a majority of the employees and such an agreement sought by a union representing none or only a minority of the employees. By agreeing to hire only union members or to require new employees to join the union, the employer in either case assists the union in controlling the labor market and thereby enables it to recruit and retain members. It makes no difference to the nonunion employee who wishes to remain unorganized whether he is compelled to accede to the wishes of a majority of his fellow employees in the same shop or to the pressure of a union seeking to organize a shop in which it has not yet gained a foothold. If the employer accedes to the demand for a closed or union shop in either case, he interferes with the right of unorganized employees to remain unorganized. Such interference was not proscribed before the Garmon case, for it was merely incidental to the union's pursuit of a proper objective. Section 923 does not provide that a closed or union shop is a lawful objective when the union has a majority but an unlawful objective when it does not. It does not make the legality of concerted union activity turn on the extent of the success the union has already achieved in the particular shop it seeks to organize. Accordingly, if, as the Garmon case held, it is unlawful employer interference to make a union or closed shop agreement with a union that does not represent a majority of the employees, it is also such interference to make such an agreement with a union that does. By distinguishing between these two situations the majority opinions in the present cases at least in part repudiate the Garmon decision, and it is significant that they now point out that "our conclusions in the present case . . . are independent of, and do not rest on, our second Garmon decision, *supra*, 49 Cal.2d 595."

(*Chavez* v. *Sargent, ante,* pp. 162, 211 [339 P.2d 801].) For these reasons the Garmon case does not control the present cases.

The majority opinions hold that a closed or union shop agreement and concerted activity to achieve it are lawful, but only if a majority of the employees to be covered by the agreement wish it. Such a limitation is admittedly contrary to the law as it was understood before the enactment of the Jurisdictional Strike Act in 1947. Moreover, it finds no support whatever in that act as a reading of its provisions makes abundantly clear. In *Seven Up etc. Co.* v. *Grocery etc. Union,* 40 Cal.2d 368, 381 [254 P.2d 544, 33 A.L.R.2d 327], we sustained the constitutionality of the act and summarized its effect as follows: "Wisely or unwisely the Legislature has declared the policy of this state that an employer's business shall not be interfered with or the public welfare disrupted by reason of an argument between two or more unions as to which shall be chosen to represent his employees. . . . The act eliminates the situation where the labor organization is employer controlled, hence *an independent union is not prevented from endeavoring to organize an employer's employees when they belong to an employer controlled union or no union.*" (Italics added.) We are now told, however, that organizational pressure is "essentially a jurisdictional dispute pressure," and that "any group of employes, organized or unorganized in the formal, conventional sense, who were free of the proscribed employer influence and who determined and informed their employer through their authorized spokesman that they were unwilling to accede to the demands of an organizer or unwanted union, and that they were satisfied with the terms and conditions of their employment and wished to continue in the established employe-employer relationship, would thereby act as and constitute a 'labor organization' within the meaning of sections 1117 and 1118." (*Chavez* v. *Sargent, antc,* pp. 162, 203 [339 P.2d 801].)

To constitute a labor organization, sections 1117 and 1118 of the Labor Code require more than an agreement not to be organized. Such an organization must exist for the purpose "of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work." (Lab. Code, § 1117.) A group whose sole purpose is to express the wish of its members not to deal as a group with the employer "concerning grievances, labor disputes, wages, hours of employment or conditions of work" is obviously not an

organization that exists for the purposes stated in section 1117. It is a contradiction in terms to hold that a group whose purpose is *not* to bargain is nevertheless a bargaining agent. But even if such a group could be a labor organization under section 1117, its objection to organization of the shop could not give rise to a jurisdictional strike within the meaning of section 1118. Such a strike can only arise out of a "controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer . . . [or] the exclusive right to have its members perform work for an employer." (Lab. Code, § 1118.) The wish of all or some of the employees to work in an open shop without collective bargaining is the very antithesis of a demand for the "exclusive right to bargain collectively" or for the "exclusive right to have [their] members perform work for [the] employer." .

Even if a dispute with the fictitious organization created by the majority opinion in the Chavez case could give rise to a jurisdictional strike, there is no such dispute here. The trial court did not find that the employees had an "authorized spokesman" who informed the employer "that they were unwilling to accede to the demands of an organizer or unwanted union, and that they were satisfied with the terms and conditions of their employment and wished to continue in the established employe-employer relationship." (*Chavez* v. *Sargent, ante,* pp. 162, 203 [339 P.2d 801].) It found only that "Most of the employees of plaintiffs are not members of the defendant labor organization and the employees of plaintiffs have not at any time demanded from plaintiffs a union shop or union recognition, nor have such employees participated at any time in the negotiations for collective bargaining agreements, nor have the employees of plaintiffs designated the defendants or any of them as their representatives for collective bargaining." At most this finding simply shows that the employees were indifferent to the unions' efforts. It does not even suggest a common wish to retain the status quo. The burden of establishing the existence of a labor organization within the meaning of the Jurisdictional Strike Act is on the plaintiff seeking relief pursuant to its terms. (Lab. Code, § 1117.) It is obvious that plaintiffs did not meet this burden. They did not even attempt to do so, for the novel theory that the Jurisdictional Strike Act might be applicable to a dispute between a union and unorganized em-

ployees was yet to be suggested for the first time in the Garmon case.

The logic of the majority opinions' invocation of the Jurisdictional Strike Act would carry them far beyond where they profess willingness to go. The existence of an organization does not depend on the number of its members so long as there are more than one. Thus, if a majority of the employees in a shop are a labor organization because they wish to remain unorganized, so must be a minority that wish to remain unorganized. Any dispute between a union and the unorganized employees would result in a jurisdictional strike if the union engaged in concerted activity to advance its position. (Lab. Code, § 1118.) Under the reasoning of the majority opinions as few as two employees who did not wish to be organized would constitute a labor organization. If the terms of the act are to be thus distorted to make the unorganized organized, no concerted activity for collective bargaining is lawful unless the employees involved achieve substantial unanimity. As the majority opinions tacitly concede, no such absurd result was contemplated by the Legislature, and to avoid it, the majority opinions are driven to limit the application of the act to cases where the organizational activity is carried on by a union that does not represent a majority of the employees involved. The Jurisdictional Strike Act, however, does not provide for majority rule; majority rule is the creation of the majority opinions. By its terms the act protects the employer from jurisdictional strife between labor organizations without regard to where the preference of a majority of his employees may lie. He is entitled to relief if he proves that a jurisdictional strike exists. He need not prove that the union engaged in the proscribed activity does not represent a majority. As now amended the act affords him much less protection, and it may come as a shock to employers who assumed that they were protected from true jurisdictional concerted activities conducted by powerful contending unions to learn that relief may be secured only against the union found to represent a minority or none of the employees.

The majority opinions' reliance on section 1122 of the Labor Code is equally illogical. That section provides that ''Any person who organizes an employee group which is financed in whole or in part, interfered with or dominated or controlled by the employer or any employer association, as well as such employer or employer association, shall be liable

to suit by any person who is injured thereby. Said injured party shall recover the damages sustained by him and the costs of suit.'' We are told that ''The proscription in this language extends not alone to the act of organizing an employee group *financed* by an employer but also to organizing any group of employes wherein the act of organizing such group, i.e., obtaining the consent of the employes to join in the organization, is either 'interfered with or dominated or controlled by the employer.' . . . For an employer to notify his employes that he has agreed with a union which is, and which he knows to be, unauthorized and unwanted by his employes, that they must join such union and be represented by it or be dismissed from employment would appear to constitute an unlawful interference by the employer and subject him to the liability imposed by section 1122.'' (*Chavez* v. *Sargent, ante,* pp. 162, 205 [339 P.2d 801].)

Section 1122 was added to the Labor Code in 1955 by the same act that amended section 1117 to put the burden on the plaintiff of establishing the existence of a labor organization. (Stats. 1955, ch. 1417, §§ 1-2.) Its obvious purpose is to prevent abuse of the Jurisdictional Strike Act by discouraging employers from organizing company unions to create the appearance of jurisdictional strikes when none in fact exist. It prohibits, not the execution of union or closed shop agreements with independent unions, but the organizing of an employer-interfered-with group. Moreover, if it did constitute employer interference within the meaning of section 1122 to execute a closed or union shop agreement with a union that does not represent a majority of the employees, it would likewise constitute such interference to execute such an agreement with a union representing a majority of them. Here, as in the case of the Jurisdictional Strike Act, however, the majority opinions shrink from the logic of their position and read into section 1122 language that is not there to permit what in their view would be employer interference but for the wish of a majority of the employees to have a closed or union shop agreement. Before the decision in the Garmon case it was settled that the proscription of employer interference in section 923 of the Labor Code did not outlaw closed or union shop agreements even though the employees did not wish them. Not only must the similar inhibitions of section 1122 be interpreted in accord with the established interpretation of section 923 at the time section 1122 was enacted, but the failure of the Legisla-

ture to amend section 923 when it enacted both the Jurisdictional Strike Act and section 1122 affords cogent evidence that it approved the existing interpretation of section 923. (See *People* v. *Nash, ante,* pp. 36, 46-47 [338 P.2d 416]; *Cole* v. *Rush,* 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137]; *Buckley* v. *Chadwick,* 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242].)

Thus, neither the Jurisdictional Strike Act nor section 1122 of the Labor Code supports a reinterpretation of section 923 to restrict the right of workmen to engage in concerted organizational activity. Before the Garmon decision such activities were fully protected as part of the individual workman's "full freedom of association, self-organization, and designation of representatives of his own choosing." (Lab. Code, § 923.) Of course the right of a union effectively to compete for employment on satisfactory terms for its members by seeking a closed or union shop interferes with the right of nonunion workmen to go it alone. Its recognition is not at war, however, as the majority opinions suggest, with either union democracy or majority rule unless the relevant majority is determined with myopic vision. A union that seeks control of available employment cannot arbitrarily close its ranks to qualified workmen or deny them full participation in its councils (*James* v. *Marinship Corp.,* 25 Cal.2d 721, 730-734 [155 P.2d 329, 160 A.L.R. 900]; *Thorman* v. *International Alliance etc. Employees,* 49 Cal.2d 629, 632 [320 P.2d 494]), and accordingly, democratic representation must be afforded to those the union claims the right to represent. Moreover, by approving the legality of a closed or union shop when a majority of the workmen directly involved wish it, the majority opinions recognize that the right to remain unorganized is subject to legitimate group interests and pressures. By looking only to the workmen immediately involved, however, the majority opinions blind themselves to the essential interrelation of working conditions in competitive businesses and choose as the relevant group whose majority may govern, not all of the workmen with interests in common, but only a small fraction of them. It is true that we have no mechanism for determining whether a majority of all workmen with common interests do or do not wish collective bargaining through unions in which they may freely participate, but if each workman the union seeks to represent is protected in his right to participate in union affairs, the danger of a minority thrusting itself on an unwilling majority in the labor market would be remote.

Moreover, the "outcome of concerted activities for a closed shop depends largely on public sentiment. No competitive business can endure indefinitely without good will; no group of workers can long define the terms of its employment without public support." (*Park & T. I. Corp.* v. *International etc. of Teamsters*, 27 Cal.2d 599, 608 [165 P.2d 891, 162 A.L.R. 1426].)

One searches the California statutes relied upon by the majority opinions in vain for a hint of the new law of labor-management relations set forth today. Either the proscriptions of employer interference in sections 923 and 1122 preclude closed or union shop contracts or they do not. Neither section affords any support for the conclusion that they are sometimes lawful and sometimes not, depending on the wishes of a majority of the employees directly involved. The requirement of majority rule has been lifted from section 8 (a) (3) (i) of the federal Labor Management Relations Act. (29 U.S.C., §§ 158, 159.) Such borrowing is obviously a legislative function. Moreover, the administrative machinery that is not only basic to the operation of the federal act but necessary to make section 8 (a) (3) (i) effective and workable is not so easily come by. The majority opinion in the Chavez case suggests that employers and unions may cooperate in conducting free elections, and so I suppose they may. But who is to determine the appropriate bargaining unit or conduct an election when the parties disagree or refuse to cooperate? (See §§ 8(a) (3) (i); 9 (b); 29 U.S.C. §§ 158, 159.) These difficulties, of course, only emphasize the impropriety of usurping the legislative function. If we are to have a little Labor Management Relations Act, it is for the Legislature, not this court to enact it.

I am convinced that union or closed shop agreements and concerted activities to achieve them are lawful under the law of this state whether or not a majority of the employees wish them. The majority opinions do not state that any of the cases so holding were wrongly decided, but apparently convinced that the time is now ripe for striking a new balance between the rights of organized and unorganized labor and employers, they seize upon the Jurisdictional Strike Act to achieve an objective foreign to its purpose. By enacting the Jurisdictional Strike Act the Legislature did not change or modify the policy set forth in section 923 insofar as purely organizational union activity is concerned. Only by amending that act by judicial fiat to provide for "majority rule" and applying it when it is obviously inapposite do the majority opinions achieve their

aims. The conclusion is inescapable that in both method and result they have usurped legislative power.

Gibson, C. J., concurred.

Petitioners' application for a rehearing was denied June 18, 1959. Peters, J., did not participate therein. Gibson, C. J., and Traynor, J., were of the opinion that the petition should be granted.